UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIMINAL NO. 07-81 (1) (JNE/JSM)

    Plaintiff,

v.                                           REPORT AND RECOMMENDATION

INDADEEQ OMAR (1),

    Defendant.


JANIE S. MAYERON, United States Magistrate Judge

    The above matter came on before the undersigned upon defendant Indadeeq Omar's Motion to Suppress any Evidence Obtained as a Result of Search and Seizure [Docket No. 49] and Motion to Suppress Statements, Admissions, and Answers [Docket No. 50]. Assistant United States Attorney Michelle E. Jones appeared on behalf of the Government; Tim Anderson and Shannon Elkins appeared on behalf of defendant, who was personally present. The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

    Based upon the pleadings, exhibits submitted at the hearing, pre-hearing submissions, and oral argument it is recommended that:

    1.    Defendant's Motion to Suppress any Evidence Obtained as a Result of Search and Seizure [Docket No. 49] be **DENIED**; and

    2.    Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 50] be **DENIED** as moot based on the representation of defendant's counsel at the hearing that there were no statements made.

## I.  FACTUAL BACKGROUND

### A.  July 6, 2005 Search Warrants

Special Agent Brian Pitzen, with the Internal Revenue Service, prepared search warrant applications for the residences of Mohamed Essa and Indadeeq Omar located at XXXXX WW, Eden Prairie, Minnesota (Government Ex. 1) and XXXXX LD, Eden Prairie, Minnesota (Government Ex. 2), and a storage unit located at XXXX BLR, Edina, Minnesota (Government Ex. 3).  The items to be seized from these locations consisted of documents pertaining to numerous individuals, including defendants in the present matter, Global Interpreters, Global Language Consultants, Telesoma, Inc., and Crystal Line Communications.  The documents to be seized included:

- Receipts, invoices, notes, journals, ledgers, financial/net worth statements, and documents relating to income and/or expenditures.

- Records in hard copy or electronic format that relate to the preparation or filing of health care claims.

- Address or telephone books that reflect or indicate involvement with the health care scheme and related activities.

- Documents related to payment forms or correspondence with heath care providers.

- Personal identification information (i.e., addresses and social security numbers) pertaining to patients used in the scheme.

- List of names or other personal identification information that may identify clients or employees of Global Interpreters.

- Bank documents.

- Documents evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment, and/or expenditure of money.

- All other records related to health claims submitted to Medica or any other health insurance company during 2001, 2002, 2003 and 2004, including client lists, claims, work orders, and worker orders.

- Addresses, names, telephone numbers, lists or files that may indicate employees of any of the above-mentioned businesses.

- Indicia of occupancy, residency and/or ownership of the premises described in the search warrant.

- Cash in excess of $10,000.00.

See Government Exs. 1-3, Attachment A.

The search warrants were signed by United States Magistrate Judge Franklin Noel.  See Government Exs. 1-3.

### B.    July 8, 2005 Search Warrants

On July 8, 2005, Special Agent Pitzen applied for two separate search warrants relating to two safety deposit boxes with Wells Fargo bank under the control of Mohamed Essa and Indadeeq Omar.  See Government Exs. 4, 5.  The search warrants were signed by United States Magistrate Judge Franklin Noel on July 8, 2005.  The items to be seized were identical to those listed for the July 6, 2005 search warrants. See Government Exs. 4, 5, Attachment A.

### C.    March 13, 2007 Indictment

On March 13, 2007, an Indictment was returned against defendants Indadeeq Omar and Mohamed Essa, and Tou Chaiker Vang.  Defendants Omar and Essa were charged  with the following: one count of Conspiracy to Commit Health Care Fraud in Violation of 18 U.S.C. § 1347; twelve counts of Health Care Fraud in violation of 18 U.S.C. § 2 and 18 U.S.C. § 1347; one count of Money Laundering Conspiracy in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (B)(i); nineteen counts of Concealment of

Money Laundering in violation of 18 U.S.C. § 2 and 1956(a)(1)(B)(i); and six counts of Promotion of Money Laundering in violation of 18 U.S.C. § 2 and 18 U.S.C. § 1956(a)(1)(A)(i).[1]

Defendant Omar has brought a motion to suppress evidence seized pursuant to the court-issued search warrants in this case.

## II.   MOTION TO SUPPRESS EVIDENCE

Omar has attacked the finding of probable cause on which the five search warrants at issue are based, by generally challenging the validity of the search warrants on their face.

Ordinarily, searches pursuant to a warrant are reviewed to determine if there was probable cause for the search in the search warrant application and affidavit.  Illinois v. Gates, 462 U.S. 213, 236 (1983).  "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place."  United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).

The task of a court issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Gates, 462 U.S. at 238.  In reviewing this decision of the issuing court, the duty of the reviewing court is simply to ensure that the issuing court

---

[1]    This Court notes that defendant Vang was charged with all counts save for counts 15-34 for Concealment of Money Laundering.

had a substantial basis for concluding that probable cause existed. Id. at 238-39 (citation omitted).

Given this standard of review, the Court will now proceed to determine whether the search warrants at issue in this case were supported by probable cause. Suffice it to say, in the 25 pages of single-spaced type, the affiant set out in great detail facts to support his belief that defendants Essa and Omar were engaged in conduct which amounted to health care benefit fraud, illegal structuring of transactions to avoid reporting requirements, and tax evasion, and why evidence of these activities would be found at two homes owned by them, and a storage facility and safety deposit boxes rented by them.[2]

### A.    July 6, 2005 Search Warrants for the Residences and Storage Unit

The relevant portions of the affidavits accompanying the search warrants that described the basis for the searches of the residences of located on WW and LD, Eden Prairie, Minnesota, and a storage unit located on BLR, Edina, Minnesota are as follows:[3]

- Mohamed Essa ("Essa") and defendant Indadeeq Omar ("Omar"), husband and wife, have an ownership interest in several business including: Global Interpreters, Telesoma, Crystal Line Communication, IFTIN 2 Entertainment Center, Somali Community of Minnesota, and Star Gift Store. See Government Exs. 1-3, Affidavit of Brian Pitzen, ¶ 12. Global Interpreters and Crystal Line Communication have the same address as the XXXXX LD residence that was focus of one of the search warrants. Id.

---

[2]    This Court notes that the defendants in this case were not indicted on tax evasion or illegal structuring of transactions to avoid reporting requirements of their financial institutions. However, allegations of these crimes were included in the search warrant application and therefore, were relevant to Magistrate Judge Noel's determination of whether probable cause existed to believe that evidence of a crime could be found at the relevant addresses.

[3]    This Court notes that the affidavits for the three search warrants were identical.

- Global Interpreters, owned by Essa and Omar, has contracted in the past with Medica, a health maintenance organization based in Minnesota, to provide translation services to members seeking medical treatment.  Id., ¶ 13.

- In the fall of 2004, the Special Investigations Unit ("SIU") of Medica conducted a routine audit, which discovered a large number of interpreter claims from its members without a corresponding medical visit, all of which were submitted by Global Interpreters.  Id.

- From January 2001 to December 2004, Global Interpreters billed and was paid by Medica for interpreter services in the amount $1.7 million.  Id. Approximately $1 million of the interpreter fees did not have a corresponding doctor visit during the same period of time.  Id.

- Global Interpreters deposited almost all of the reimbursement checks for interpreters received from at least 2001 to 2004 in an account at Bremer Bank.  Omar was the only authorized signer on the account.  Id.

- On October 26, 2004, Medica SIU investigators interviewed Essa and Omar who told Medica they receive forms called "Worker Order" from interpreters with whom they contract.  Id. They also stated that Global Interpreters pays the interpreters 80% of interpreter claim, which is paid prior to the claim being submitted to Medica, and it keeps 20%.  Id.

- While Essa initially denied that any fraudulent claims had been submitted to Medica, he later admitted that Global Interpreters had a couple of bad interpreters who allegedly deceived them by submitting fraudulent Work Order forms.  Id.  Global Interpreters forwarded 268 claims to Medica that it claimed were the fraudulent claims from the bad interpreters, which had been submitted prior to January 2004.  Id.  SIU investigated these claims and determined that there were many more claims, not provided by Global Interpreters, that had no corresponding medical visit, and that the problem of interpreter claims with no corresponding medical visits continued throughout 2004.  Id.  In addition, the SIU investigator discovered multiple instances of Global Interpreters billing for interpreter services for Medica's members whom had used a different interpreter service for medical visits.  Id.

- Medica terminated the interpreter contract with Global Interpreters, effective December 2004, because Essa and Omar had failed to provide Medica with requested documentation.  Id.

- Medica wrote letters to its members for whom Global Interpreters had submitted claims, advising them it was no longer an interpreter provider.  Id. Medica received responses from ten of its members who stated that they had never used Global Interpreters for any services, and that several of the callers spoke English perfectly well.  Id.

- Essa and Omar operated Global Interpreters and Crystal Line Communications from a leased space owned by Regus Corporation. Id. The leased space was predominately paid for by Global Interpreter's bank account. Id. The lease was terminated in January 2005 and all of the property was removed from the space. Id. Global Interpreters maintained a virtual office with Regus Corporation, which provided a telephone answering service and mailing address. Id. All calls are forwarded to a voice mail account and the mail was picked up once a week. Id. The billing address given to Regus by Essa was XXXXX WW.

- On March 3, 2005, Essa called Medica to complain about having Global Interpreter's contract cancelled. He initially stated that Global Interpreter's records had been destroyed but then stated that they were in storage. Id.

- In support of the belief that defendants were engaged in the illegal structuring of cash deposits to avoid reporting requirements dictated to financial institutions by 31 U.S.C. § 5324, the affidavit set forth that Essa and Omar deposited large sums of cash into a variety of accounts at Wells Fargo in order to avoid the reporting requirements. Id., ¶ 23. Specifically, Wells Fargo records showed that multiple cash deposits had been made on the same day into several different accounts in the names of Essa and Omar's children and their businesses, that most of the time the deposits were below the reporting requirements, and that eventually, these monies were transferred into the personal accounts of Essa and Omar. Id., ¶¶ 23-26.

- On August 27, 2004, money transferred into Essa and Omar's personal accounts, in the amount of $205,985.00, was put into a cashier's check payable to Omar, and used to purchase the residence at XXXXX WW. Id., ¶ 27.

- Based on the affiant's knowledge and experience, people who commit financial crimes prefer to use cash as a method of payment and it is highly unusual for people to deposit large amounts of cash several times a day and then transfer the money into their personal checking accounts later that same day or on the following days. Id., ¶ 29. Transferring large amounts of cash into a minor's accounts is also unusual. Id.

- On several days during the time period of January 11, 2002 thorough February 27, 2004, Omar cashed up to 20 checks written from Global Interpreter's account within five minutes of each other at Bremer Bank. Id., ¶ 31. These checks were deposited into an account on which Omar and Essa were signatories. Id. During this period, a large number of checks totaling $229,895.00 were deposited in this manner into this account. Id. These checks, usually just under $10,000, were written to different individuals, and were then endorsed over in manner that allowed Omar to cash them. Id., ¶¶

31-32.  These activities violated Bremer Bank policy because the endorser of the check was required to be present and provide photo identification.  Id., ¶ 32.  When confronted with this violation of bank policy, Omar stated that she had been depositing such checks in this manner since 2001.  Id.  In late 2003, Omar began depositing such checks at Bremer Bank in a more frequent manner.  The branch manager of the Bremer Bank and her co-worker went to the address listed on the bank account and could not find Global Interpreters at this location.  Omar was then told by bank employees that she would no longer be allowed to cash checks for other people in the future, and each employee must be present and provide identification.  Id., ¶ 33.  Account records showed that after this date, no other checks were cashed at this bank.  Id.

- An analysis of employee payroll checks written by Global Interpreters showed that most of them were written to an individual, which Omar represented to the bank manager at Bremer Bank were "employee payroll checks."  Id., ¶ 34. The analysis also showed that very few people received more than one check, and that few checks were negotiated by the person to whom it was issued.  Id.  The analysis further showed that a large portion of checks were double endorsed with a unique second endorsement and deposited into Omar and Essa's personal account at Wells Fargo Bank.  Id., ¶ 35.  Employee payroll checks totaling in excess of $100,000 were deposited into Omar and Essa's personal account at Wells Fargo.  Id.

- Based on the affiant's training and experience, he believed that the cash, employee payroll checks, and Global Interpreters checks deposited into Omar and Essa's bank accounts were taxable amounts that should have been included on their tax returns.  See Government Exs. 1-5, Affidavit of Brian Pitzen, at p. 14.  In support of this belief, research of IRS databases for the years 2000-2004 showed that Global Interpreters had not filed tax returns for 2003 and 2004.  Id., ¶ 39.  Further, during the period of 2001 to the date of the application for the search warrant, Global Interpreters had only filed two W-2's for reporting wages of employees.  Id.  In addition, while Global Interpreters claimed it had approximately 72 subcontractors, it had failed to file any Form 1099, which is used to report to the IRS how much money was paid to subcontractors.  Id.

- Omar and Essa claimed to operate an unregistered business called Telesoma, Inc.  Id. ¶ 39.  Telesoma maintained a bank account with Wells Fargo Bank, with Omar and Essa serving as the only signatories to the account.  Id.  The account is registered to the XXXXX LD residence.  Id.  This account was opened on March 14, 2002 with $1000.  No additional deposits were made to the account, and only one check was written against this account, from March 2002 through September 2004.  Id.  Between August 2004 and September 2004, $63,220.00 was deposited into this account.  Id. On August 24, 2004, a $20,000 transfer was made from this account to Omar

and Essa's personal account.  Id.  Of the money deposited in the Telesoma account, $20,000 was deposited into four separate cash denominations under $10,000 at four separate Wells Fargo branches on September 27, 2004 between 3:39 p.m. and 6:51 p.m.  Id.  A 2005 Chrysler 300 costing $43,114.00 was purchased from this account in September of 2004.  Id. Based on the affiant's training, experience and analysis of the bank account, including the multiple cash deposits on the same day at different locations, the affiant believed that the account was being used solely for personal use and not a business purpose, and that Essa and Omar  were attempting to disguise the transactions and avoid filing of CTR's.  Id.

- Omar and Essa are the registered agents for Crystal Line Communications. Id., ¶ 40.   Crystal Line Communications is registered to the XXXXX LD residence, the personal residence of Omar and Essa.  Id.  Crystal Line Communications has one bank account and Omar and Essa are the sole signatories of this account.  Id.  The account is also registered to XXXXX LD. Cash deposits of $72,000 were made to this account during 2003.  The affiant stated that this income were proceeds from Global Interpreters scheme, and income to Omar and Essa, or even if it was not, it amounted to gross receipts for Crystal Line Communications, and was taxable income to it.  Id.  The IRS has never received a tax return from Crystal Line Communications.  Id.

- During the years 2001 and 2002, Essa and Omar failed to claim any income from Global Interpreters, even though they received income from Global Interpreters through cashed and deposited employee payroll checks, and from checks written to themselves.  Id., ¶¶ 42-45.  Instead, in 2001 and, Essa and Omar's total W-2 wages only showed the wages received by Essa from the Somali Community of Minnesota for that year.  Id., ¶¶ 43, 44.

- In 2003, Essa received $31,200 in checks from Global Interpreters, however, neither Essa nor Omar reported this income on their tax return.  Id., ¶ 45.

- Essa and Omar had failed to file a return for 2004, by the date of the search warrant applications.  Id., ¶ 46.

- From 2001 to 2003, Essa and Omar received $83,235.00 from Global Interpreters, Omar and Essa deposited a large number of "employee payroll checks" into their personal bank accounts, and Omar had cashed $229,235.00 in employee payroll checks from Global Interpreters, all of which was not included in their tax returns.  Id., ¶ 47.

- Global Interpreters wrote a check for $18,900.00 for the down payment on the purchase of the XXXXX WW residence.  Id., ¶ 48.

- In 2003, Essa and Omar paid off their mortgage, in excess of $100,000, for the XXXXX LD residence.  Id., ¶ 49.  In 2004, Essa and Omar bought the

residence at XXXXX WW for $595,000.  Id.  In 2005, Essa purchased a vehicle for $43,1120, and Essa and Omar have a house in Columbia Heights, Minnesota, valued at $225,000, with an outstanding mortgage of $50,000.  Id. Based on Agent Pitzen's training, experience, and his review of Essa and Omar's tax returns, the purchases made by Essa and Omar are not consistent with the income they have reported on their tax returns.  In addition, in the residential loan application for the WW residence, Essa and Omar claimed $14,500 in monthly income, with Omar earning $8,000 a month of that amount from Global Interpreters.  Id.  Yet, in 2003, Omar only claimed $32,500 of income in her tax return from Global Interpreters for the entire year.  Id.  Essa has never reported any income from Global Interpreters.  Id.

- Persons from Wells Fargo have reported that bank accounts, containing a check return provision, in the name of relevant businesses and personal accounts were listed as registered to the XXXXX LD residence.  Id., ¶ 50.

- In support of the affiant's belief that there was probable cause to believe that evidence of the criminal activities described in the affidavit would be found at a residence at LD, the affiant stated that a neighbor of the XXXXX LD residence reported that he or she had seen several boxes of paper that appeared to be business records inside the residence and a room with 15 padlocks on the door.  Id., ¶ 51.  When the neighbor asked Essa what was in the room, Essa became nervous and stated he did not have the key for the room.  Id.  In addition, this individual reported seeing a Chrysler 300 and a white van with Somali Community of Minnesota on the side at this residence. ¶ 52.  Essa has a 2005 Chrysler registered to his name and the van was observed at the residence in June 2005.  Id.

- In support of the affiant's belief that there was probable cause to believe that evidence of the criminal activities described in the affidavit would be found at a resident on WW, the affiant stated Essa told a neighbor of the XXXXX LD residence that he had purchased a million dollar home across the road by a golf course, and that he was in the process of moving everything of value over to the new house.  Id., ¶ 53.  Surveillance conducted showed that automobiles registered to Omar and Essa were located at the XXXXX WW residence.  Id.  Further, Omar, Global Interpreters, and Crystal Line Communications all received mail at the XXXXX WW residence.  Id.

- In support of the affiant's belief that there was probable cause to believe that evidence of the criminal activities described in the affidavit would be found at a storage unit on BLR, the affiant stated that Omar rented space at a storage unit located at XXXX BLR, Edina, Minnesota starting on February 18, 2004, under the name of Global Interpreters.  Id., ¶ 56.  On January 5, 2005, the manager of the storage units opened up the storage unit rented by Global Interpreters because it had not paid the rent on the unit.  Id.  The manager took a picture of the contents in the storage unit, which included some boxes

and computer equipment.  Id.  On February 10, 2005, Global Interpreters paid its past due rental fees.  Id.  Records show that Global Interpreters entered the storage unit on March 14, 23, and 24, 2005.  Id.  Global Interpreters was current on the rent for the storage unit up through July 18, 2005.  Id.

Given all of this information, a reasonable person could conclude that there was evidence of a crime located at the LD residence, the WW residence, and at the storage unit located at BLR.  The affidavits set forth facts establishing that Global Interpreters, owned by defendants Essa and Omar, had submitted fraudulent claims for interpreter fees that did not have corresponding doctor visits, and that the checks were deposited into a bank account in which Omar was the only signatory.  The affidavits also provided that Essa and Omar had residences at  WW and LD, and that the billing address for Global Interpreters was WW.  In addition,  Omar, Global Interpreters, and Crystal Line Communications all received mail at the WW residence and, surveillance confirmed that automobiles registered to Omar and Essa were located at the WW residence.

Further, the affidavits set forth evidence demonstrating that Omar and Essa transferred and deposited large amounts of cash into a variety of bank accounts in order to avoid the reporting requirements.  Many of these bank accounts listed LD as the registered address for the accounts.  In addition, the affidavits provided information from a witness that the LD residence contained several boxes of paper that appeared to be business records inside the residence and a room with 15 padlocks on the door.

Finally, the affidavits set forth information that Essa and Omar failed to report income received from Global Interpreters in their tax returns and that unreported income may have been used to pay for the WW and LD residences.

In sum, the information provided in the affidavits showed that Essa and defendant Omar were allegedly involved health care fraud, illegal structuring of deposits

to avoid reporting and tax evasion, and tied these activities to the WW and LD addresses.

As for the storage unit located at BLR, the affidavits established that Omar had rented the storage space on behalf of Global Interpreters.  The affidavit alleged facts linking Omar and Global Interpreters to health care fraud and tax evasion.  In addition, the affidavits contained the statements of a witness that the contents of the storage unit included some boxes and computer equipment, and the statement of Essa made to a Medica investigator that records from Global Interpreters were in storage.

In summary, all of these facts taken together provide a fair probability that evidence of crimes involving health care fraud, illegal structuring of deposits to avoid reporting, and tax evasion would be found at the WW residence, the LD address, and the storage unit located at BLR.  Therefore, based upon the totality of the circumstances, this Court finds that substantial evidence existed to support the finding of probable cause to issue the search warrants for the XXXXX WW residence, the XXXXX LD residence, and the storage unit located at XXXX BLR.

**B.    July 8, 2005 Search Warrants for the Safety Deposit Boxes**

On July 8, 2005, Special Agent Pitzen sought search warrants for safe deposit boxes #439 and #1252 at Wells Fargo Bank.  See Government Exs. 4, 5.  The application stated that there was good reason to believe that the safe deposit boxes contained the same items sought in the July 6, 2005 search warrant, supra.  Id., Attachment A.

The applications and affidavits drafted by Special Agent Pitzen for the safe deposit boxes relied on the facts set forth in the affidavits submitted in support of the

July 6, 2005 search warrants of the two residences and storage unit (Government Exs. 1-3) and the following additional facts:

- During the July 7, 2005 execution of the search warrant at XXXXX WW, special agents from the IRS located what appeared to be two keys for safe deposit boxes.  One key was located in an envelope with the number "439" written on the outside.   The second key was found in an envelope with "Northwest Bank" and the number "1252" written on the outside.

- Pursuant to a Grand Jury Subpoena issued to Wells Fargo Bank, formally Northwest Bank, the affiant learned that Essa and Omar have two safe deposit boxes at two separate Wells Fargo branches numbered 439 and 1252.

Special Agent Pitzen's affidavits have alleged sufficient facts linking Essa and Omar to health care fraud, illegal structuring of deposits to avoid reporting, and tax evasion, and also sufficiently linked them to the safe deposit boxes at issue.  All of this information provided a fair probability that evidence of a crime, including relevant documents and cash, could be found in the safe deposit boxes.

For all of the reasons stated above,  this Court recommends that defendant's motion to suppress evidence obtained from the July 6 and 8, 2005 search warrants be denied.

## RECOMMENDATION

For the reasons set forth above, it is recommended that:

1.    Defendant's Motion to Suppress any Evidence Obtained as a Result of Search and Seizure [Docket No. 49] be **DENIED**; and

2.    Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 50] be **DENIED** as moot based on the representation of defendant's counsel at the hearing that there were no statements made.

\Dated:      July 10, 2007

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge


Under D. Minn. LR 72.1(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 27, 2007**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this rule shall be limited to ten pages.  A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **July 27, 2007**.